**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AMANDA J. HUNTINGTON, | ) | |
| | ) | CASE NO. 1:13CV759 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
|    Acting Commissioner of | ) | |
|    Social Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Amanda Jane Huntington ("Huntington") challenges the final decision of the

Acting Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying her

claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and

Supplemental Security Income ("SSI") under Title(s) II and XVI of the Social Security Act

("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq.*  This matter is before the Court pursuant to 42

U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. §

636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is VACATED

and the case is REMANDED for further proceedings consistent with this Opinion.

## I.  Procedural History

On August 13, 2009, Huntington filed applications for POD, DIB, and SSI, alleging a disability onset date of March 31, 2009 and claiming she was disabled due to fainting spells, bipolar disorder, and post-traumatic stress disorder.  (Tr. 130-136, 152.)  Her application was denied both initially and upon reconsideration.  (Tr. 65-71, 77-90.)  Huntington timely requested an administrative hearing.

On August 4, 2011, an Administrative Law Judge ("ALJ") held a hearing during which Huntington, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 29-60.)  On September 16, 2011, the ALJ found Huntington was able to perform her past relevant work as a cleaner and, therefore, was not disabled.  (Tr. 15-23.)  The ALJ's decision became final when the Appeals Council denied further review.  (Tr. 1-4.)

## II.  Evidence

### Personal and Vocational Evidence

Age thirty-one (31) at the time of her administrative hearing, Huntington is a "younger" person under social security regulations.  (Tr. 35.)  *See* 20 C.F.R. § 404.1563(c) & 416.963(c). Huntington has an eleventh grade education and past work as a cashier, nursing assistant, deli clerk, fast food worker, window maker, and cleaner.  (Tr. 44, 53-54.)

### Relevant Medical Evidence[1]

---

[1]As it is not relevant to Huntington's grounds for relief, the Court will not recount the medical evidence regarding her bipolar disorder and left knee and leg pain in this Opinion. Rather, the Court will limit its discussion to the medical evidence regarding Huntington's syncope.  The Court further notes that Huntington's brief does not comply with this Court's Initial Order, as it fails to set forth all facts relevant to the legal issues raised.  (Doc. Nos. 5, 15.) Therefore, this Court incorporates the relevant medical facts regarding Huntington's syncope from the Commissioner's brief.

On March 25, 2009, Huntington presented to the emergency room ("ER") after experiencing four episodes of syncope, preceded by dizziness and nausea.  (Tr. 281.)  She underwent a "complete work up" at the hospital, including an electrocardiogram, CAT scan, chest x-ray, and blood work. (Tr. 281-282.)  All test results returned normal, with the exception of a urinalysis which showed a possible urinary tract infection.  (Tr. 281-288.)  The ER physician concluded Huntington's "multiple syncopal episodes [were] likely due to dehydration with urinary tract infection" and side effects from her depression medications.[2]  (Tr. 282.)  Huntington was given IV fluids and discharged.  (Tr. 282.)

Five days later, on March 30, 2009, Huntington returned to the ER after fainting while walking into her kitchen and waking up on the floor.  (Tr. 248.)   The ER nurse noted there was a "bump" on Huntington's forehead and the middle of her hairline was "reddened, raised." (Tr. 251.)  Huntington reported she had passed out several times over the past few days. (Tr. 251.)  A CAT scan of her brain was negative.  (Tr. 260.)  Huntington was diagnosed with vertigo and vasovagal syncope; prescribed Antivert; and, discharged.  (Tr. 252.)

On April 1, 2009, Huntington presented to Sanjay Parikh, M.D., of the Neurology Center, Inc. for an initial evaluation.  (Tr. 305.)  She reported passing out four to five times per day and hitting her head "numerous times."  (Tr. 305.)  Huntington stated "her last spell was this morning when she was in the shower standing and she passed out and hit her head."  (Tr. 305.)  She stated she was "out for awhile and when she woke up she was having some speech difficulty and . . . tingling and numbness on the left side for a few minutes to an hour."  (Tr. 305.)  Dr. Parikh

---

[2]  At the time of this ER visit, Huntington was taking Zoloft, Seroquel, and, Plaquenil.  (Tr. 281.)  She was also taking Medrol Dosepak and Tylenol #3 for her arthritis.  (Tr. 281.)

diagnosed her with vasovagal syncope but noted "other form of seizure or cardiac arrhythmia could not be ruled out." (Tr. 305.)  He advised her not to drive, and indicated she should consult with a psychiatrist and cardiologist.  (Tr. 305.)  In addition, Dr. Parikh ordered a 48-hour video electroencephalogram ("EEG").  (Tr. 307.)  The test results, dated April 27, 2009, find "normal awake and drowsy 48 hour video [EEG] monitoring with various stages of sleep. Clinical correlation strongly recommended." (Tr. 294.)

On April 17, 2009, Huntington presented to David B. Joyce, M.D., of the Cleveland Clinic for a cardiology consult.  (Tr. 378-381.)  Huntington stated she had experienced episodes of syncope four to five times per day for the last three weeks, with no "premonitory symptom." (Tr. 378.)  Dr. Joyce ordered an echocardiogram, a 48 hour holter monitor, and blood work.  (Tr. 379.)  He also advised her not to drive.  (Tr. 379.)

Huntington returned for a cardiac follow-up appointment with Dr. Joyce on May 1, 2009. At that time, Dr. Joyce noted Huntington's echocardiogram and blood work were normal and her holter study was "normal (including during episode of syncope)" with "some inappropriate sinus tachycardia."  (Tr. 373-374.)  He ordered a tilt table study.  (Tr. 374.)  On May 15, 2009, Huntington presented to Dr. Joyce reporting continued syncopal spells.  (Tr. 361.)  Dr. Joyce noted Huntington's tilt table study was "markedly abnormal."  (Tr. 361.)  He stated she should not drive and, further, that she should "avoid prolonged standing."  (Tr. 362.)

Huntington also presented to Dr. Parikh in May 2009 for follow up of "her recurrent syncopal episodes."  (Tr. 302.)  She reported "having one or two spells a day, sometimes two to four." (Tr. 302.)  Dr. Parikh noted that cranial nerve examination was normal, extraocular movements were intact, and that Huntington's "[c]oordination, station, and gait were appropriate

4

for [her] age."  (Tr. 303.)

In June and August 2009, Huntington reported her syncopal episodes had decreased from five times a day to two to three times per day since starting Metoprolol.  (Tr. 357, 359, 341.)  Dr. Joyce noted Huntington had experienced "marked improvement though still quite disabling." (Tr. 358.)  He also opined Huntington's use of Seroquel could be causing her syncopal episodes and advised her to check with her psychiatrist to determine if she could take a "Seroquel holiday . . . to see if syncope resolves."  (Tr. 343.)  When Huntington returned for a follow-up visit in September 2009, she reported she had stopped taking Seroquel but was still experiencing syncope two to three times daily.  (Tr. 682.)  In October 2009, she reported that she "continues to pass out 2-3 times daily.  Now w/ severe headache and intermittent loss of bowel and bladder function and some blurry vision."  (Tr. 673.)  Dr. Joyce directed her to go to the ER.  (Tr. 669, 675.)

On November 25, 2009, Huntington presented to Dr. Joyce for a follow-up appointment. (Tr. 669.)  Dr. Joyce noted that Huntington "reports multiple episodes of syncope though I have never observed one."  (Tr. 669.)  He indicated he had directed Huntington to go to the ER on several occasions because it would benefit her to be monitored in the hospital when she has a syncopal episode.  However, he reported Huntington "will not go [to] the emergency room or stay in the ER long enough to be considered for admission."  (Tr. 670.)  As a result, he noted her "[s]yncope has been very difficult to define."  (Tr. 669.)  Dr. Joyce indicated he wanted Huntington to obtain a second opinion from Dr. Fetnat Fouad at the Cleveland Clinic Main Campus.  He also stated "[i]f she truly has [syncopal episodes] 2-3 times per day, it may be helpful to hospitalize her and monitor the true occurrence."  (Tr. 670.)

The Commissioner asserts Huntington did not seek any medical treatment for her syncope from December 2009 until May 2011.  (Doc. No. 16 at 7.)  Huntington does not contest this statement, nor does she direct this Court's attention to anything in the record that suggests otherwise.  The Court will, therefore, assume there is no medical evidence relating to Huntington's syncope during that time period.

On May 31, 2011, Huntington presented to Dr. Parikh after having last seen him in 2009. (Tr. 641.)  She reported fainting spells two to three times per day, and blurred vision.  (Tr. 641.) Dr. Parikh ordered an EEG and advised her not to drive.  (Tr. 641.)   Huntington returned for a follow-up appointment with Dr. Parikh on June 28, 2011.  (Tr. 638.)  She reported passing out three to four times per day.  (Tr. 638.)  Dr. Parikh indicated Huntington's fainting spells "could be either sleep disorder versus seizure" and that it was necessary to "rule out any cardiac etiology." (Tr. 638.)  He noted her EEG was normal and ordered an MRI of the head, and an MRA of the head and neck.[3]  (Tr. 638.)  Dr. Parikh also advised her to see a cardiologist.  (Tr. 638.)

On August 2, 2011, Dr. Parikh wrote a letter indicating he had advised Huntington not to drive and that "Ms. Huntington needs supervision at all times." (Tr. 693.)

***Hearing Testimony***

During the August 4, 2011, Huntington testified to the following:

- She is married, but separated.  She lives with her three children, ages 8, 9, and 11.

---

[3]  Huntington underwent an MRI and MRA on July 17, 2011.  (Tr. 635-637.)  The MRAs of her head and neck were negative.  (Tr. 636-637.)  The MRI of her brain showed "incidental mild Chiari I Malformation" and "minimum mucosal thickening of the maxillary sinuses."  (Tr. 635.)  The Commissioner characterizes these findings as "unremarkable. " (Doc. No. 16 at 7.) Huntington does not argue that these MRI results are significant.  (Doc. No. 16 at 7.)

6

She has an eleventh grade education.  (Tr. 38, 44.)

- She last worked two years ago, as a state tested nursing assistant.  She had to quit that job because she "got ill and started passing out." (Tr. 35.)

- She cannot work because of her syncope and anxiety. (Tr. 49.)

- Her syncope, or fainting spells, started in March 2009. (Tr. 41.)  She passes out three to four times every day, "sometimes more." (Tr. 39.)  Heat and activity tend to trigger her fainting spells.  (Tr. 39-40.)  Her doctors have been unable to tell her what is causing them. (Tr. 36.)

- There is no warning when she is about to pass out; she just "wake[s] up on the floor." (Tr. 39.)  She falls down when she faints, often resulting in bruises, knots, and cuts. (Tr. 39.)  She is unable to shower or cook unassisted because she is afraid she will pass out and hurt herself.  She helps get her children ready for school and prepares meals for them, as long as someone is there when she uses the stove.  She needs assistance with her children, however, because they become frightened when she faints.  Her sister comes to her house every day to help.  (Tr. 38-40, 45.)  She has a driver's license but has not driven for two years per her doctors' orders.  (Tr 43-44.)

- She was on several medications for her syncope in 2009.  They did not reduce the number of her blackouts. She was without medical insurance for a year and a half. She went back on insurance in 2011, but is not taking any syncope medication. (Tr. 41-42.)

- She also suffers from panic attacks and anxiety, which make it hard for her to leave her house and be around other people.  Her anxiety also effects her concentration.  When she feels anxious, she forgets where she is and "just want[s] to run, like just leave." (Tr. 43, 46.)  She has been on psychiatric medications for the past four years.  They "help some." (Tr. 47.)

- When her children are at school, she reads books and watches television.  She can read for 15 to 20 minutes before becoming unable to concentrate.  She flips the channel on the television and "doesn't really settle on a program." (Tr. 49-50.) She has friends, but they do not come over to visit.  She only leaves the house for doctor appointments.  Her parents do her grocery shopping for her. (Tr. 50-52.)

The VE testified Huntington had past relevant work as a (1) cashier (light, unskilled); (2)

nursing assistant (medium, semi-skilled); (3) deli clerk (medium, unskilled); (4) fast food worker

(light, unskilled); (5) window maker (medium, semi-skilled); and, (6) cleaner (light, unskilled, as

7

performed).  (Tr. 54.)  The ALJ then posed the following hypothetical:

> [I]f you were to assume an individual of Ms. Huntington's age, education, work
> experience, able to lift up to 50 pounds occasionally, 25 pounds frequently,
> standing and walking maybe six out of eight, sitting maybe six out of eight.
> They can perform unlimited pushing and pulling.  Climbing of ramps and stairs
> would be limited to frequent.  They may never climb ladders, ropes or scaffolds.
> Must avoid all exposure to hazards and in this sense, it's determined or defined
> as unprotected heights and hazardous machinery.  An individual with those
> limitations, would they be able to perform her past relevant work?

(Tr. 54.)  The VE testified such a hypothetical individual would be able to perform Huntington's

past relevant work as a cashier and cleaner, but none of her other past relevant work.  (Tr. 55.)

      The ALJ then added to the first hypothetical the limitation that the hypothetical individual

would also have to avoid concentrated exposure to heat.  (Tr. 55.)  The VE testified that such a

hypothetical individual would be able to perform Huntington's past relevant work as a cashier

and cleaner, but none of her other past relevant work.  (Tr. 55.)  The ALJ then posed the

following series of hypotheticals:

> ALJ:   Add on to that hypothetical, this individual now has to have two-to-four
> step tasks. Duties are relatively static, changes can be explained. We are
> going to have superficial contact with others, meaning, co-workers,
> supervisors, and the public.  And I don't want any tandem tasks with co-
> employees or co-workers.  Would that individual be able to perform her
> past relevant work?

> VE:    The job of a cashier, Judge, would not fall within those parameters.  It
> would be beyond the 2/4 step process.  The job of a cleaner, in my opinion,
> would fall within those parameters.

> ALJ:   Okay.  I want to add, this individual would need to avoid any requirements
> for commercial driving.  Would that individual be able to perform past
> relevant work?

> VE:    The job of a cleaner, the work demands of a cleaner would not involve
> driving, Judge, but, certainly, a person would have to get to and from work.

> ALJ:   Okay. So, I'm talking about not on the job.

8

VE:    Then that would not be a factor, Judge, in terms of the cleaning position.

ALJ:   You've heard the testimony given today by Ms. Huntington in terms of the numbers of times she passes out during the course of a day, three to four times, we are talking about; could be unexpected; happen at any time. And, assuming the record supported that, and it was viewed as credible, would this be an individual that would be able to work in competitive place of employment?

VE:    I don't think employers would tolerate that, Judge.

ALJ:   And in terms of, within the employment, what would be customary tolerances employers would have with respect to unexcused, unscheduled absences?

VE:    A person could normally expect one vacation day, one sick day per month, Judge.  Anything beyond that would be outside the norm, especially for unskilled work.

(Tr. 55-56.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[4]

---

[4]  The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled.  For the fifth and final step, even though the claimant's impairment does prevent

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Huntington was insured on her alleged disability onset date, March 31, 2009, and remained insured through the date of the ALJ's decision, September 16, 2011. (Tr. 15.) Therefore, in order to be entitled to POD and DIB, Huntington must establish a continuous twelve month period of disability commencing between those dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

## IV. Summary of Commissioner's Decision

The ALJ found Huntington established medically determinable, severe impairments, due to syncope, obesity, and bipolar disorder; however, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 15-19.) Huntington was found capable of performing her past work activities, and determined to have a Residual Functional Capacity ("RFC") for a limited range of medium work. (Tr. 19-22.) The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony

---

performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

to determine that Huntington was not disabled.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by

substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  Analysis

### *Treating Physicians Parikh and Joyce*

In her first three grounds for relief, Huntington argues the ALJ failed to mention or properly evaluate medical opinions offered by treating physicians Parikh and Joyce.  Specifically, Huntington maintains the ALJ failed to acknowledge, or provide good reasons for rejecting, Dr. Parikh's opinion that Huntington "needs supervision at all times."  (Doc. No. 15 at 3; Tr. 693.) She also argues the ALJ failed to address Dr. Joyce's opinions that Huntington should "avoid

12

prolonged standing" and that her condition was "quite disabling." (Doc. No. 15 at 4-5; Tr. 362, 358.)

The Commissioner argues Dr. Parikh's and Dr. Joyce's opinions do not constitute "medical opinions" under 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) because they are simply "isolated comments in the treatment notes."[5] (Doc. No. 16 at 10.) As such, the Commissioner maintains they "do not trigger specific duties" on the ALJ, such as the duty to provide good reasons for rejecting a treating physician's opinion. In addition, the Commissioner argues substantial evidence supports the decision, noting "the ALJ provided numerous, well-supported reasons why he found that Plaintiff's syncope did not impose significant work-related limitations." (Doc. No. 16 at 10.)

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Indeed, "[t]reating

---

[5] The Commissioner does not challenge Doctors Parikh and Joyce's status as treating physicians.

source medical opinions are still entitled to deference and must be weighed using all of the factors

provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[6]

     If the ALJ determines a treating source opinion is not entitled to controlling weight, "the

ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242 (quoting Soc.

Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5). The purpose of this requirement is two-fold.

First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,'

particularly where a claimant knows that his physician has deemed him disabled and therefore

'might be bewildered when told by an administrative bureaucracy that she is not, unless some

reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378

F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating

physician rule and permits meaningful appellate review of the ALJ's application of the rule."

*Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has

held that the failure to articulate "good reasons" for discounting a treating physician's opinion

"denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified

based upon the record." *Rogers*, 486 F.3d at 243.

     Nevertheless, the opinion of a treating physician must be based on sufficient medical data,

---

[6] Pursuant to 20 C.F.R. § 404.1527(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Here, the ALJ discussed Huntington's Function Reports and hearing testimony; the medical evidence regarding her syncope; and, the opinions of unidentified "State agency medical consultants and psychological consultants."[7] (Tr. 22.)  With respect to Huntington's treating

---

[7] The Commissioner notes that state agency physician Nick Albert, M.D., completed a Physical RFC Assessment on November 24, 2009. (Tr. 429-437.) Therein, Dr. Albert determined Huntington retained the capacity to occasionally lift/carry fifty pounds; frequently lift/carry twenty-five pounds; stand and/or walk about six hours in an eight hour workday; and, sit about six hours in an eight hour work day. (Tr. 430.) He found she had unlimited push/pull capacity and could frequently climb ramps and stairs but never ladders, ropes, or scaffolds. (Tr. 430-31.) Dr. Albert also assessed no environmental limitations, but noted Huntington should avoid unprotected heights and operating hazardous machinery because of her syncope. (Tr. 433.) In June 2010, state agency physician Walter Holbrook, M.D., affirmed Dr. Albert's Physical RFC.

15

physicians, the ALJ states only:

> Given her allegations of totally disabling impairments, one might expect to see
> some indication in the treatment records of restrictions placed on the claimant by
> a treating physician.  Yet, the record does not contain any opinions from treating
> or examining physicians indicating that the claimant is disabled or even has
> limitations greater than those determined in this decision other than Sanjay
> Parikh, MD's note prohibiting the claimant from driving. (Exhibit 24F).

(Tr. 22.)  The ALJ then finds Huntington's "alleged symptoms are not consistent with the

objective medical findings of record as a whole" and, further, that her testimony was "not credible

to the extent that she claims to be unable to perform any work." (Tr. 22.)

The ALJ formulated the RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the
> residual functional capacity to perform medium work as defined in 20 CFR
> 404.1567(c) and 416.967(c) except she is able to lift up to 50 pounds
> occasionally, 25 pounds frequently.  She can stand and walk 6 hours out of an 8
> hour day, and sit 6 hours of an 8 hour day.  She can perform unlimited pushing
> and pulling.  She is limited to frequently climbing ramps and stairs, and never
> climbing ladders, ropes, and scaffolds.  She must avoid all exposure to hazards,
> defined as unprotected heights and hazardous machinery.  She must avoid
> concentrated exposure to extreme heat.  She has to have 2 to 4 step tasks, with
> duties that are relatively static and where changes can be explained.  She can have
> superficial contact with others, meaning coworkers, supervisors and the public.
> She cannot do tandem tasks with coworkers or others.

(Tr. 19.)

The Court rejects the Commissioner's argument that Dr. Parikh's conclusion Huntington

"needs supervision at all times" does not constitute a "medical opinion."  Under Social Security

regulations, "medical opinions" are defined as follows:

> Medical opinions are statements from physicians and psychologists or other
> acceptable medical sources that reflect judgments about the nature and severity of

---

(Tr. 523.)  Although the decision does not specifically identify these state agency opinions, it
appears the ALJ gave them "great weight." (Tr. 22.)  Huntington does not object to this finding.

16

your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

20 C.F.R. § 404.1527(a)(2) & 416.927(a)(2). Dr. Parikh's assessment that Huntington "needs supervision at all times" is a statement reflecting his judgment about the severity of her syncope and her physical restrictions as a result of that impairment. While the Commissioner complains that Dr. Parikh fails to sufficiently explain this assessment in his August 2, 2011 letter, the Court notes the record contains numerous treatment notes from Dr. Parikh, in which he describes Huntington's clinical history; diagnoses her condition; orders objective medical testing; reviews test results; prescribes medication; and, sets forth limitations on her activities as a result of her impairments. (Tr. 305-307, 302-303, 574 -575, 641-643, 638-640.) Read in the context of these treatment notes, Dr. Parikh's statement that Huntington "needs supervision at all times" is sufficient to constitute a "medical opinion" for purposes of §§ 404.1527(a)(2) and 416.927(a)(2).[8]

Moreover, the Court rejects the Commissioner's argument that Dr. Parikh's statement does not constitute a "medical opinion" because it is merely an "isolated comment in the treatment

---

[8] Although neither cited or discussed by either party, the Court finds that *Dunlap v. Comm'r of Soc. Sec.*, 2012 WL 6700319 (6th Cir. Dec. 27, 2012) is distinguishable from the instant case. In *Dunlap*, the Sixth Circuit found a treating physician's "single-sentence note" did not constitute a "medical opinion" for purposes of § 404.1527(a)(2). The court also found that a subsequent, more comprehensive report from that same physician did not constitute a "medical opinion" because it simply restated the underlying evidence in Dunlap's medical records. However, in *Dunlap*, the single-sentence note in question simply stated that "[i]n my medical opinion, Mr. Dunlap has severe low back pain and due to his pain is unable to work." *Id.* at * 2. The Sixth Circuit found this note did not constitute a "medical opinion" because "the conclusion expressed by Dr. Redmon . . . was one properly reserved to the Commissioner." *Id.* at *3. The instant case is distinguishable, however. Dr. Parikh's letter herein sets forth specific physical restrictions that, in his professional opinion, resulted from Huntington's impairments. Moreover, Dr. Parikh's treatment notes do not simply restate the medical evidence underlying Huntington's condition, but offer specific diagnoses, treatment plans, and restrictions relating to her condition.

notes." (Doc. No. 16 at 10.) The mere fact that Dr. Parikh's assessment is set forth in a letter, as opposed to on a particular form, is not necessarily determinative of whether it constitutes a "medical opinion." Indeed, several courts have found that treating physician opinions set forth in letters and treatment notes constitute "medical opinions" for purposes of the regulations. *See e.g. Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (finding treating physician's treatment notes constituted a "medical opinion" for purposes of §§ 404.1527(a)(2) and 416.927(a)(2) and, therefore, ALJ was required to "explicitly consider and explain the weight accorded" to the opinions contained in those notes); *Bradley v. Astrue*, 2011 WL 2618741 at * 4 (M.D. Tenn. July 1, 2011) (finding letter submitted by treating physician setting forth claimant's physical restrictions constituted a "medical opinion" for purposes of regulations); *Sandlin v. Astrue*, 2008 WL 4402205 at * 4 (E.D. Ky. Sept. 24, 2008) (finding letter submitting by treating physician that sets forth diagnosis of claimant's impairments and states "I do not feel [claimant] should be physically stressed in any manner," constituted a "medical opinion").

Further, the Court notes this is not a situation where the treating physician's opinion was buried in voluminous treatment notes and not brought to the ALJ's attention. In her pre-hearing Memorandum, Huntington specifically draws the ALJ's attention to Dr. Parikh's August 2, 2011 letter stating Huntington needs supervision at all times, and expressly identifies it as a "supporting medical source statement." (Tr. 230.) Indeed, the ALJ specifically references Dr. Parikh's August 2, 2011 letter in the decision and characterizes Dr. Parikh's statement therein that Huntington should not drive, as a treating physician opinion. (Tr. 22, citing Exh. 24F.) Inexplicably, however, the ALJ fails to address in any fashion Dr. Parikh's opinion in that same letter that Huntington "needs supervision at all times." (Tr. 22.)

18

Based on the above, the Court finds Dr. Parikh's opinion that Huntington "needs supervision at all times" constitutes a "medical opinion" for purposes of §§ 404.1527(a)(2) and 416.927(a)(2).  Therefore, and because Dr. Parikh was Huntington's treating physician,[9] the ALJ was required to provide "good reasons" for rejecting it, but failed to do so.  The decision does not address this particular opinion at all, much less provide "good reasons" for failing to accord it controlling weight.  Moreover, the decision fails to mention any of the factors set forth in 20 C.F.R. § 404.1527(d), such as the length of the treating relationship, the frequency of examination, the nature and extent of the treatment relationship, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.  While the Commissioner argues the ALJ provided "numerous, well-supported reasons why he found that Plaintiff's syncope did not impose significant work-related limitations," the fact remains the ALJ did not connect any of these reasons to the rejection of Dr. Parikh's opinion.  Rather, the ALJ simply failed to discuss Dr. Parikh's opinion at all, leaving this Court with no reasoned explanation as to why that opinion was rejected.  The Court finds this to be error.

For similar reasons, the Court finds the ALJ erred in failing to acknowledge or address Dr. Joyce's opinion that Huntington should "avoid prolonged standing."  (Tr. 362.)  As noted above,

---

[9]  The Commissioner does not argue that Dr. Parikh is not Huntington's "treating physician" for purposes of social security regulations.  Accordingly, and in light of the fact the record indicates Dr. Parikh examined Huntington at least five times between April 2009 and August 2011, the Court assumes for purposes of this Opinion that Dr. Parikh was Huntington's "treating physician" when he offered his opinion that she needs supervision at all times.  (Tr. 305-307, 302-303, 574 -575, 641-643, 638-640.)

19

this opinion is set forth in treatment notes dated May 15, 2009.  (Tr. 362.)  These treatment notes, and Dr. Joyce's opinion as set forth therein, were brought to the ALJ's attention in Huntington's pre-hearing Memorandum.  (Tr. 230.)  Like Dr. Parikh's August 2011 letter, Dr. Joyce's May 2009 treatment notes do not provide a lengthy explanation of the basis for his assessment that Huntington should avoid prolonged standing.  However, the Court notes that the record contains treatment notes from eight occasions between April 2009 and November 2009 when Huntington presented to Dr. Joyce for treatment.  (Tr. 378-384, 373-376, 360-364, 356-359, 341-346, 682-686, 673-677, 668-672.)  Taken together, these notes provide a detailed picture of Dr. Joyce's diagnosis of Huntington's impairments; treatment efforts; medical testing; and, opinions regarding Huntington's physical limitations as a result of her syncope.  Read in the context of these notes, the Court finds Dr. Joyce's statement in his May 2009 treatment notes that Huntington should "avoid prolonged standing" constitutes a "medical opinion" for purposes of § 404.1527(a)(2) and 416.927(a)(2).[10]

The Commissioner does not challenge that Dr. Joyce was Huntington's treating physician at the time he proffered the opinion at issue.  Thus, assuming for purposes of this Opinion that Dr. Joyce was, in fact, a treating source, the ALJ was required to provide "good reasons" for rejecting his opinion.  The decision, however, does not address this opinion in any fashion.  Indeed, the decision does not mention Dr. Joyce at all, despite the fact that he treated Huntington at least

---

[10]  As noted *supra*, the fact that Dr. Joyce's opinion appears in treatment notes rather than a particular form does not foreclose it from being considered a "medical opinion." *See e.g. Winschel*, 631 F.3d at 1179 (finding treating physician's treatment notes constituted a "medical opinion" for purposes of §§ 404.1527(a)(2) and 416.927(a)(2) and, therefore, ALJ was required to "explicitly consider and explain the weight accorded" to the opinions contained in those notes).

20

eight times between May 2009 and November 2009.  Once again, while the Commissioner argues the ALJ provided "numerous, well-supported reasons why he found that Plaintiff's syncope did not impose significant work-related limitations," the fact remains that the ALJ did not connect any of these reasons to the rejection of Dr. Joyce's opinion.

Accordingly, and for all the reasons set forth above, the Court finds the ALJ failed to provide "good reasons" for rejecting Dr. Parikh's and Dr. Joyce's opinions.  The Court further finds that a remand is necessary to afford the ALJ an opportunity to sufficiently evaluate and explain the weight ascribed to these opinions.  As this matter is being remanded for further proceedings, and in the interest of judicial economy, the Court will not consider Huntington's remaining assignments of error.

## VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner not supported by substantial evidence.  Accordingly, the decision of the Commissioner is VACATED and the case is REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Opinion.

IT IS SO ORDERED.


/s/ Greg White
U.S. Magistrate Judge

Date: January 30, 2014